## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **HERITAGE MINISTRIES d/b/a HOMESTEAD HERITAGE,** | § § § | |
| *Plaintiff,* | § | Case No. 6:25-cv-00364-LS |
| **v.** | § § | |
| **INDEPENDENT DIGITAL NEWS & MEDIA, LTD.,** | § § § | |
| *Defendant* | § § | |

## DEFENDANT'S MOTION TO DISMISS

Defendant Independent Digital News & Media, Ltd. ("The Independent" or "Defendant") respectfully submits this Motion to Dismiss Plaintiff's Second Amended Complaint ("SAC" or "Complaint") pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Plaintiff brings its defamation and unjust enrichment claims arising from an article published by The Independent about the experiences of former members of Homestead Heritage, a controversial religious community that has been the subject of much media coverage. Plaintiff does not dispute that The Independent accurately reported these former members' accounts of their experiences; rather, Plaintiff challenges statements in the article that are not about it, mischaracterizes statements to create defamatory meaning where none exists, challenges opinions that are non-actionable, and ignores The Independent's privileges to report true accounts on matters of public concern. Because

Plaintiff's claims fail on both procedural and substantive grounds, its case should be dismissed with prejudice pursuant to FRCP 12(b)(6).[1]

## FACTUAL BACKGROUND

### The Article

On September 19, 2024, The Independent published an article titled "Living in a 'cult' was all she knew – until a traumatic birth pushed her to escape" (the "Article"). *See* SAC Ex. A. The Article recounts the experiences of former members of Homestead Heritage, a religious community located in Waco, Texas that, according to its website, "host[s] over 200,000 visitors each year to [] festivals, events, and services,"[2] and "has received much unsolicited media attention from both local and national sources." Homestead Heritage Response, https://response.homesteadheritage.com/2012-response-to-criticism/ (last visited November 15, 2025). Homestead Heritage has previously been described as a "Christian craft-based community" with a "dark side," that includes accusations of child abuse, beatings, and cover-ups.[3]

---

[1] Plaintiff has already re-pleaded its claims twice and could not articulate a cognizable claim. It should not be given a third bite at the apple.

[2] Homestead Initial Response, https://response.homesteadheritage.com/homestead-initial-response/ (last visited November 21, 2025).

[3] *See* Alex Hannaford, Heritage of Abuse, Texas Observer, April 23, 2012 ("Waco religious group accused of child abuse, beatings and cover-ups), available at https://www.texasobserver.org/heritage-of-abuse/; Brett Shipp, Waco Religious Commune Accused of Masking Abuse, WFAA, April 26 2012, available at https://homesteadheritageinfo.blogspot.com/2016/06/wfaa-investigates-homestead-heritage.html; Carena Liptak, Rory Feek's Daughters Are Pursuing Legal Action Against Him – Here's Why, Taste of Country, August 29, 2024 ("The community has a lengthy track record of sexual and domestic abuse allegations, and multiple members have been convicted of sex crimes against minors"), available at https://tasteofcountry.com/rory-feek-heidi-feek-homestead-heritage-child-abuse/; Emma Ruby, They Who Have Been Exiled: The Strict Religious Group Behind I-35's Cheese Cave, Dallas Observer, April 9, 2025 ("Homestead Heritage has a dark side to its Christian craft-based community"), available at https://www.dallasobserver.com/news/the-strict-waco-religious-group-behind-i-35-

The Article at issue described the community from the viewpoint of individuals who have chosen to step away from life at Homestead Heritage and repeatedly provided responses from the community and those mentioned therein. According to the Article, "[t]ourists visit Homestead Heritage's handicraft shops and farm-to-table restaurant, and school children come by on field trips for horse drawn hayrides," but "those who've exiled themselves from the community say life inside is far more sinister, with a lack of education, adequate medical care and life options leaving them traumatized." SAC Ex. A. When asked about the claims in the Article, a spokesperson for Homestead Heritage stated: "There is absolutely no truth to these allegations, and the assertion that we are anything other than an open, thriving church family is false." *Id.*

The Article recounts the experiences of two former members – Noa Haugh and Morning Alexander – both of whom filed a complaint with the state against Amanda Lancaster, a midwife "who they say is unlicensed, practicing medicine illegally and left one of them with long term debilitating birth injuries." *Id.* Significantly, Lancaster is not a plaintiff here. In the Article, Lancaster admits she is not a state licensed midwife and does not deny the women's claims, but in a letter republished in full by The Independent says that she is a "traditional birth attendant" and that the allegations made by Haugh and

---

cheese-cave-22050059/. Under Fed. R. Evid. 201(b), the Court may take judicial notice of the existence of these newspaper articles. *See United States v. Tenet Health Corp.,* 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) (judicial notice includes "the power to take judicial notice of the coverage and existence of newspaper and magazine articles) (citing *Jackson v. Godwin,* 400 F.2d 529, 536 (5th Cir. 1968); *Roque v. Harvel,* 2019 WL 5265292, at *9 n.7, No. 17-CV-932 (W.D. Tex., Oct. 16, 2019) (same); *Holcomb v. McCraw,* 262 F. Supp. 3d 437, 449 n.3 (W.D. Tex. 2017) (taking judicial notice of media reports about how weapons are being disguised as toys and how experienced law enforcement struggles to differentiate between real and fake weapons, and overruling plaintiffs' objections based on lack of authentication, lack of foundation, and lack of reliance).

Alexander were "never brought to me either directly or from a third-party agency" and that they "don't reflect the reality of my experience nor any of the wonderful correspondence and communication I have received regarding any birth in my care." *Id.*

As relevant here, the Article recounts that on the day she gave birth, Noa Haugh "says she did not receive pain medication, nor did she ask for it, because it went against church policy." SAC Ex. A. The Article includes Homestead Heritage's denial that "it has 'no policy whatsoever on the use of pain medication.'"[4]  *Id.* According to Haugh, while pushing out her baby she suffered a third-degree tear, and "Lancaster administered local anesthesia and sewed the area back together."  *Id.* After she left the church and became pregnant with her second child, however, she suffered "significant pain" and her new midwife told her "she had been improperly sewn up during her first birth, which led to her tissue not healing correctly." *Id.*   According to the Article, Haugh "says the procedure left her with permanent injuries to her pelvic floor." *Id.* She subsequently filed a complaint against Lancaster with the Texas Department of Licensing and Regulation (TDLR). *Id.*[5] Because the incident occurred outside the statute of limitations, however, TDLR did not pursue Haugh's complaint. *Id.*

Non-party Lancaster was also Morning Alexander's midwife for the birth of both of her children. SAC Ex. A. The Article recounts that when Alexander went into labor early with her second child, her baby was in breech. *Id.* According to the Article, Alexander

---

[4] Plaintiff's Complaint falsely alleges that The Independent's reporter "received multiple answers to her inquiries from Heritage, none of which were included or incorporated into her story." SAC ¶ 5.

[5] The new midwife submitted a statement to TDLR advising "[h]ad the repair following …birth been done correctly, the pelvic floor muscles would have been joined together preventing the rectocele and resulting in a stronger pelvic floor."

"says that Lancaster manually turned her daughter out of the breech position and then broke her water using an amnicot, a medical glove with a pricked fingertip." *Id.* The Article reports that "[a] representative for TDLR told *The Independent* that unlicensed midwives cannot . . . manually turn a breech baby or break a pregnant person's water." *Id.* Alexander subsequently joined Haugh's TDLR complaint against Lancaster. In response to Alexander's allegations, Lancaster told The Independent that the allegations "appear to stem from a misunderstanding and/or misrepresentation of the roles and practices within our community and its standard of care regarding childbirth and healthcare." *Id.* According to the Article, Alexander eventually left the church when her first child was a toddler because "she disagreed with the church's use of corporal punishment." *Id.* She then started questioning the groups' theology. " 'Once you start to pull on the thread, the whole thing comes out,' she said." *Id.*

The Article also includes allegations by Noa Haugh's sister-in-law, Tabitha Haugh. Tabitha alleges that she was homeschooled by her mother, and that she "learned the ABCs but that was pretty much it. There was no history, math, science, nothing." SAC Ex. A. In response, the Article quotes a spokesperson for Homestead Heritage who states that "While we have found homeschooling to be very effective, each family is free to choose its own curriculum and teaching." *Id.* The Article also reports that "At Homestead Heritage, women are expected to get married and reproduce." *Id.* It recounts how when Tabitha Haugh turned thirty, "she started questioning her life. She says church leaders hadn't allowed her to get married, with one telling her, as she explained, 'I was not worthy of being a wife at the moment because I was not showing wife character traits.'"

### *The Complaint*

Plaintiff, who claims to be "doing business as" Homestead Heritage, filed its

Second Amended Complaint on October 23, 2025. In it, Plaintiff claims it was defamed

by a number of statements in the Article. Because the SAC takes many, if not all, of the

statements out of context, Defendant has provided the full context in which each of the

allegedly defamatory statements appear below (italics indicate the portions actually

included in the SAC):[6]

| **COMPLAINED OF STATEMENTS ("COS") IN ARTICLE** |
|---|
| COS 1 - "Two of the women [who left the community] later filed a complaint with the state against the community's midwife, who they say *is unlicensed, practicing medicine illegally and left one of them with long term debilitating birth injuries.* |
| COS 2 - "*At Homestead Heritage, women are expected to get married and reproduce.*" |
| COS 3(a) - "[Noa Haugh] says she *did not receive pain medication, nor did she ask for it, because it went against church policy.* |
| COS 3(b) - Noa [Haugh] says she did not see any other medical professionals in the days and months following her birth and says the procedure left her with *permanent injuries to her pelvic floor.*" |
| COS 4 - "When she turned 30, [Tabitha Haugh] started questioning her life. She says *church leaders hadn't allowed her to get married*, with one telling her, as she explained, 'I was not worthy of being a wife at the moment because I was not showing wife character traits.'" |

---

[6] Elsewhere in the SAC, Plaintiff claims that two statements are false but not defamatory: (1) that Tabitha lost her home due to her decision to leave Homestead Heritage; and (2) that Tabitha was fired for leaving the church. In both instances, the Article includes Homestead Heritage's response to these allegations. Because Plaintiff does not claim these statements constitute actionable defamation, Defendant does not address them in this motion.

<u>COS 5</u> - "As a child, Tabitha [Haugh] dreamed of becoming a doctor. Instead her mother homeschooled her. 'I learned the ABCs but that was pretty much it,' Tabitha said during a recent phone call. 'There was *no history, math, science, nothing*.'"

<u>COS 6</u> - "But those who've exiled themselves from the community say life inside is far more *sinister, with a lack of education, adequate medical care and life options leaving them traumatized*."

Plaintiff also brings a claim for unjust enrichment based entirely on the publication of the Article, and the alleged "benefit" Defendant received in publishing the Article. SAC ¶¶ 25 & 26.

Because the Complained of Statements fail to state a claim for defamation, and because Plaintiff has not stated a claim for unjust enrichment and that claim may not be maintained under the First Amendment where Plaintiff's defamation claim fails, for the reasons set forth more fully below, Plaintiff's SAC should be dismissed.

## **LEGAL STANDARD**

Under FRCP 12(b)(6), a complaint must be dismissed unless a plaintiff pleads "sufficient facts to state a claim for relief that is facially plausible." *Wellington v. Tex. Guaranteed,* No A-13-CA-077-SS, 2014 WL 2114832, at *2 (W.D. Tex. May 20, 2014). A plaintiff must plead "more than unadorned 'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action,' or 'naked assertion[s]' devoid of 'further factual enhancement.'" *Shannon v. Allstate Corp.,* No. 1:20-CV-448-LY, 2021 WL 8083333, at *7 (W.D. Tex. May 24, 2021). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006).

## ARGUMENT

In order to prevail on its defamation claim, Plaintiff must prove that The Independent:  (1) published a factual statement (2) that was capable of a defamatory meaning, (3) that was "of and concerning" it, (4) with the requisite degree of fault, and (5) without any applicable privilege. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Here, the Article is about the experiences of former members of a religious community that has been the subject of "much media coverage," and it accurately conveys those former members' allegations about matters of public concern. Fairly read, the statements about which Plaintiff complains are either not about Plaintiff, do not convey the defamatory meaning Plaintiff claims, constitute protected opinion, and/or are privileged under Texas law.[7] For these reasons, therefore, set forth more fully below, Plaintiff's claim against The Independent should be dismissed.

## I.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR DEFAMATION.

### A.    Plaintiff Cannot Meet Its Burden of Demonstrating that COS 1, 3, and 5 Are "Of and Concerning" It.

It is a matter of black letter law that to maintain a defamation action, a plaintiff must be referenced in the statements at issue. *Vice v. Kasprzak*, 318 S.W.3d 1, 12 (Tex. App.—Hou. [1st Dist.] 2009, pet. denied); *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 894 (Tex. 1960) (The statement must "point to the plaintiff and to no one else."). Whether a plaintiff is referenced in a statement is a question of law. *Matthews*, 339 S.W.3d at 893. When the plaintiff is not mentioned by name, conclusory assertions that people who know plaintiff will know that allegedly defamatory statements are "of and concerning" it is not

---

[7] A chart, reflecting the Complained of Statements and the defenses that apply to each, is attached hereto as Appendix 1 for the Court's convenience.

sufficient to satisfy plaintiff's burden. *Allstate Ins. Co. v. Plambeck*, No. 3-08-CV-0388-M-BD, 2012 WL 2130982 (N.D. Tex. Jan. 4, 2012), *report and recommendation adopted*, 2012 WL 2130912 (N.D. Tex. June 12, 2012).

Here, COS 1 clearly states that Amanda Lancaster – *i.e.*, the "community midwife" – was accused by Noa Haugh and Morning Alexander of being "unlicensed, practicing medicine illegally and [leaving] one of them with long term debilitating birth injuries." The statement does not "accuse[] Heritage of the crime of practicing midwifery without a license," as Plaintiff claims. SAC Summary. Because the Article explicitly names the person allegedly responsible for unlawful acts, Plaintiff's contention that the article implicates it instead is not supported by the plain language of the Article or the law. *See Matthews*, 339 S.W.2d at 894 (where article named two body shop operators as part of a professional ring of car wreckers, plaintiff body shop owner's contention that the article implied he was running the ring as a front for the operators was not consistent with the plain language of the article). Thus, because on its face the Article refers to "the community midwife" and not to Homestead Heritage, COS 1 is not "of and concerning" Plaintiff.

Similarly, both COS 3(a) and 3(b) are about how Noa Haugh was treated by Amanda Lancaster and are not about Homestead Heritage. Specifically, 3(a) references pain medication that Lancaster did not provide to Haugh (and which Haugh did not ask for) "on the day she gave birth" after laboring for seven hours and "pushing for three of them." SAC Ex. A. COS 3(b) is about how Haugh "did not see any other medical professionals in the days and months following her birth and says the procedure left her with permanent injuries to her pelvic floor." *Id.* Like COS 1 and 3(a), this statement is also about how Noa Haugh was treated by Lancaster and is not about Homestead Heritage.

9

Finally, COS 5 is about Tabitha Haugh's mother, not about Homestead Heritage. It specifically says that Tabitha Haugh's "mother homeschooled her." SAC Ex. A. One paragraph later the Article includes Plaintiff's statement that "While we have found homeschooling to be very effective, each family is free to choose its own curriculum and teaching." SAC Ex. A. Thus, COS 5 clearly lays responsibility for Tabitha Haugh's lack of formal education on the homeschooling provided by her mother and includes Plaintiff's disavowal of any responsibility for that schooling. Therefore, COS 5 is not "of and concerning" Homestead Heritage.

**B.    Plaintiff Cannot Meet Its Burden of demonstrating that COS 2, 3(a), 4 And 5 Are Capable of a Defamatory Meaning.**

Plaintiff cannot satisfy its burden of demonstrating that COS 2, 3(a), 4 and 5 are defamatory and/or have the defamatory meaning Plaintiff ascribes to them. *See Musser v. Smith Protective Services, Inc.*, 723 S.W.2d 653, 654 (Tex. 1987) ("In trying a libel action, the initial question for determination is a question of law to be decided by the court: were the words used reasonably capable of a defamatory meaning."). A statement is defamatory if "'tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Innovative Block of South Texas, Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409 (Tex. 2020) (quoting Restatement (Second) of Torts § 559); *see also* Tex. Civ. Prac & Rem. Code § 73.001 ("CPRC") (a libel "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule"). In making the initial determination of whether a publication is capable of being defamatory, a court examines its "gist." *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013). That is, courts construe the publication "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence

would perceive it." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *see also Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) ("It is well settled that 'the meaning of a publication and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.'").

Here, Plaintiff claims that COS 2 is defamatory because "Heritage's women (described as oppressed or less-than by the Independent) are OB/GYNs, published authors, CPAs, business owners, nurses, dieticians, EMTs, paramedics, educators, actresses, ballet dancers, artists, medical sales reps, and professional counselors." SAC ¶ 8. But leaving aside whether a person can get married and still perform one of the occupations listed by Plaintiff, COS 2 does not accuse women of being oppressed but, rather, of a common societal expectation: *i.e.*, getting married and having children. Quite simply, such a statement does not expose a person to "public hatred, ridicule, or financial injury," CPRC § 73.001, and therefore is not defamatory as a matter of law.

Plaintiff also claims that COS 3(a) is defamatory because "Heritage has no policy whatsoever on the use of pain medication." SAC 8. But the Article includes Heritage's statement that "it has 'no policy whatsoever on the use of pain medication.'" SAC Ex. A. Moreover, even if COS 3(a) could be construed to state definitively that Homestead Heritage has a policy against the use of pain medication, there is nothing hateful about having a policy against taking pain medication, and Plaintiff does not contend otherwise.

As for COS 4, it does not state, as Plaintiff claims, that "church leaders hadn't allowed [Tabitha Haugh] to get married." SAC ¶ 5(d). Rather, in context, COS 4 is about Haugh's own crisis when she turned thirty and "started questioning her life." According to

Haugh, "church leaders [told] her, as she explained, 'I was not worthy of being a wife at the moment because I was not showing wife character traits.'" SAC Ex. A. As the Article recounts, Haugh says she drove to an overlook and "broke down crying … looking up at the stars and asking herself why everything felt so vast, yet her life felt shrunk down to nothing." *Id.* Thus, COS 4 cannot be read as Plaintiff contends, but it is, instead, about Haugh's personal crisis at a crucial point in her life when she finally summoned the courage to leave Homestead Heritage.

Finally, COS 5 does not state, as Plaintiff claims, "That home education under Heritage includes 'no history, math, science, nothing.'" SAC ¶ 5(e). Rather, the statement is about the homeschooling Tabitha Haugh received from her mother. SAC Ex. A. In context the statement is not defamatory because accusing someone of providing a less-than-formal education does not expose that person to public hatred, contempt, or ridicule.

## C.    COS 6 is Not Actionable Because It Is Protected Opinion.

When an opinion does not contain a provably false statement of fact, it cannot give rise to a defamation claim. *A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71, 79-80 (Tex. App.—Ft. Worth 1982, writ ref'd n.r.e.). Here, COS 6 is clearly protected opinion because it reflects the experiences of "those who've exiled themselves from the community," and cannot be proven false. For example, it is not possible to measure whether "life inside" a community is "sinister." *See, e.g., Daniels v. Metro Magazine Holding Co., L.L.C.*, 634 S.E.2d 586, 591 (N.C. Ct. App. 2006) (whether plaintiff spoke in a "sinister" voice was a matter of opinion, incapable of being proven true or disproved). Similarly, whether former members were "traumatized" is not something that can be proven true or false. *See, e.g., Cummings v. City of New York*, No. 19-CV-7723, 2020 WL 882335, at *26 (S.D.N.Y. Feb. 24, 2020) (characterization of events as "traumatic" was expression of opinion incapable

of being provably true or false); *Taylor v. St. Louis Community College*, No. 18-CV-00272, 2018 WL 5078360, at *8 (E.D. Mo. Oct. 18, 2018) (characterization of plaintiff's behavior as "threatening and traumatizing" was protected opinion because it was not capable of being proven false). Finally, assertions about the "*lack* of education," "*adequate* medical care" and "*life options*" at Homestead Heritage are opinions and reflect the former members' own characterizations of their lives at Homestead Heritage and cannot be proven false, particularly where, as here, the factual bases for those characterizations are fully set forth. *See A.H. Belo*, 644 S.W.2d at 80 (allegedly defamatory statement was protected opinion where characterization was "contained in an article which accurately sets forth the characterization's factual basis").

### D.    COS 1, 3(b), 5 And 6 Are Privileged As Fair Reports Or Fair Comments About Matters Of Public Concern.

The U.S. Constitution and Texas common and statutory law all recognize a privilege for fair reporting on official proceedings and comments about matters of public concern. The statutory privileges are codified in CPRC § 73.002(b). The fair comment privilege covers "reasonable and fair comment on or criticism of … matter[s] of public concern published for general information." *Id.* § 73.002(b)(2). The fair-report privilege bars liability for defamation when the publication is a "fair, true, and impartial account" of judicial, executive, and other official proceedings. *Id.* § 73.002(b)(1)(A-D). Both privileges apply here.[8]

---

[8] These privileges apply to publications by "a newspaper or other periodical," CPRC § 73.002(a), which courts have interpreted to include online publishers. *See, e.g., Walker v. Beaumont ISD.*, No. 1:15-CV-379, 2016 WL 1156852, at *2 (E.D. Tex. Mar. 24, 2016) (applying privilege to online publications).

1.    **COS 1, 5, and 6 are privileged as fair comment.**

The law has long been clear that media organizations may report and comment on matters of public concern without liability as long as the reports and comments are "the honest expression of opinion on matters of legitimate public interest." *Immanuel v CNN,* 618 F. Supp. 3d 557, 565 (S.D. Tex. 2022), citing to *Bentley v. Bunton,* 94 S.W.3d 561, 579 (Tex. 2002) (quoting *Milkovich v. Lorian Journal Co.,* 497 U.S. 1, 13 (1990); CPRC § 73.002(b)(2). The fair comment privilege clearly applies to COS 1, 5, and 6 here. Recounting the stories of women who have left the community, including their personal experiences with the community's midwife (COS 1), their lagging education (COS 5), and the lack of options they felt for their future (COS 6), present continuing matters of public concern and squarely fall within the privilege – especially when, as here, the responses of the community (and the non-party midwife) are included in the publication. *See, e.g., Swate v. Schiffers,* 975 S.W.2d 70 (Tex. App. – San Antonio 1998, pet. denied) (fair comment privilege applied to news story that detailed plaintiff's history of problems with his medical practice); *Brewer v. Capital Cities/ABC, Inc.,* 986 S.W.2d 636, 644-45 (Tex. App.—Fort Worth 1998, no pet.) (fair comment privilege applied to primarily factual account of agency inspection).

2.    **COS 3(b) is privileged as fair report.**

COS 3(b) describes Noa Haugh's childbirth experience with Lancaster at Homestead Heritage. She recounts hemorrhaging after the birth, suffering a third-degree tear, and the resultant "permanent injuries to her pelvic floor." SAC Ex. A. The Article explains that Noa filed a complaint with the Texas Department of Licensing and Regulation (TDLR) arising from this experience. It quotes from a submission made by Noa's subsequent midwife to the TDLR: "Had the repair following … birth been done correctly,

the pelvic floor muscles would have been joined together preventing the rectocele and resulting in a stronger pelvic floor." *Id.* Finally, the Article explains that nothing came of the TDLR complaint because it had been filed outside the limitations period. *Id.*

This is precisely the type of reporting the fair report privilege shields. CPRC § 73.002(a), (b)(1)(B).[9] *See, e.g., Walker v. Beaumont ISD*, 938, F.3d 724, 745-49 (E.D. Tex. 2019). Publications are privileged if they fairly and accurately reflect the proceeding, record, or official statement subject to the reporting, even if the statements in the underlying proceeding or document are ultimately false. *See Texas Monthly, Inc. v. Transamerican Nat. Gas Corp.*, 7 S.W.3d 801, 806 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (defendant "is not required to prove the truth of the allegations that it repeats to its readers"). Whether a communication is privileged is a question of law for the Court to decide. *Christy v. Stauffer Publ'ns*, 437 S.W.2d 814, 815 (Tex. 1969).

To invoke the fair report privilege, a media defendant need not specifically attribute every particular statement alleged to be defamatory. Rather, "it must be apparent either from specific attribution *or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings*." *Kinsey v. New York Times Company*, 991 F.3d 171, 180 (2d Cir. 2021) (original emphasis). *See also Healthsmart Pacific, Inc. v. Kabateck*, 7 Cal. App. 5th 416, 436 (Cal. Ct. App. 2016) (television broadcast was privileged because the "average person watching the report in its entirety would reasonably understand that [an attorney who was interviewed in the

---

[9] Texas also recognizes a fair-report privilege arising under the common law and the First Amendment. *See*, *e.g.*, *Goss v. Houston Cmty. Newspapers*, 252 S.W.3d 652, 655 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (common law); *Langston v. Eagle Printing Co.*, 797 S.W.2d 66, 70 (Tex. App.—Waco 1990, no writ) (fair-report privilege arises under the First Amendment).

segment] was referring to the allegations in the lawsuit he filed" even though "some statements, when viewed in isolation, could be understood to communicate the allegedly defamatory matter as facts, not mere allegations of facts"). In context, it is readily apparent that COS 3(b) is reporting on Noa Haugh's experience that was submitted as part of an official proceeding to TDLR and is therefore privileged as a matter of law.

### 3. The third-party allegation rule bars Heritage's claims for COS 1 and COS 3 through 6.

Homestead Heritage's claims arising from COS 1 and COS 3 through 6 fail for the additional reason that the allegedly defamatory statements are accurately reported third-party allegations – specifically  those made by former Homestead Heritage members who were recounting their experiences at Homestead Heritage – and, thus, protected both by statute and common law. The third-party allegation rule provides that liability may not be imposed against a media defendant based on "accurate reporting of allegations made by a third party regarding a matter of public concern." CPRC § 73.005(b); *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 711 (Tex. 2016). The rule, which has been part of Texas Supreme Court jurisprudence for more than 30 years, was codified by the Texas legislature in 2015, and precludes liability where a media defendant accurately reports on allegations about matters of public interest made by third parties – even if those allegations ultimately turn out to be untrue. *See, e.g.*, *Dallas Morning News v. Hall,* 579 S.W.3d 370, 380 (Tex. 2019) (recognizing statutory third-party allegation rule); *Gallaher v. Denton Media Co., Inc.*, No. 02-21-00164-CV, 2022 WL 2071779, at *9 (Tex. App.—Fort Worth June 9, 2022, no pet.) (finding that plaintiff's denial of the underlying allegations that he had been prosecuted for certain crimes, even if true, did not defeat third-party allegation protection under § 73.005(b) where media accurately reported the underlying third-party

allegations); *see also KTRK Television v. Felder*, 950 S.W.2d 100, 107 (Tex. App.—Houston [14th Dist.] 1997, no writ) (applying third-party allegation rule pre-2015 statute under common law and finding no liability for accurate reporting on third party allegations).

This rule reflects the breathing space that the First Amendment affords to reporting on matters of public concern generally, and specifically to accurate reporting of *allegations* made by other parties about such matters – regardless of the truth of those underlying allegations. *Dallas Morning News v. Hall*, 579 S.W.3d at 380 (citing CPRC § 73.005(b)) ("[M]edia outlets that accurately report allegations made by a third party about matters of public concern can assert the truth as a defense."); *Broder v. Nexstar Broad. Grp*., No. 03-19-00484-CV, 2021 WL 2273470 (Tex. App.—Austin, 2021, pet. denied) (recognizing CPRC § 73.005(b) and its protections for media outlets that accurately report third-party allegations); *see also, e.g., McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990) (defendant not liable for broadcast that accurately reported on newsworthy allegations made against municipal employees); *KTRK Television*, 950 S.W.2d at 107; *Grotti Corp. v. Belo*, 188 S.W.3d 768, 777 (Tex. App.—Fort Worth 2006, pet. denied) (dismissing claim against TV station where investigative report allegedly accused doctor of killing patients, holding that "the broadcast accurately reported on third-party allegations" made by family members, nurses, and state investigators).[10] The third-party allegation rule protects such statements as long as they were accurately reported because it is the fact that the statements were made that makes them newsworthy. *See* CPRC § 73.005(b); *Grotti*, 188 S.W.3d at 777.

---

[10] These cases were decided before the Texas Legislature codified the third-party allegation rule in 2015, further strengthening the already strong protection for accurate reports of third-party allegations on issues of public concern.

Here, COS 1 and 3(a) and (b) are accurate reports of third-party allegations made by Noa Haugh and Morning Alexander concerning their birth experiences with one of the community midwives and the injuries they allegedly received as a result. SAC Ex. A. COS 4 reports that *Tabitha Haugh* said that church leaders had not allowed her to get married (because, *as she reported*) she was not showing "wife character traits." SAC Ex. A. COS 5 reports on Tabitha Haugh's assertion that she learned the ABC's but did not receive education in history, math, or science. SAC Ex. A. Similarly, COS 6 accurately reports on the experiences of some former members and what those members report experiencing after exiling themselves from the community. SAC Ex. A.

Heritage does not dispute that the third-parties made these claims, nor that Defendant accurately reported their allegations. While Plaintiff may not like that Defendant has reported on these third-party allegations, and believe that they are not flattering, "not flattering is not defamatory—especially in the face of the third-party-allegation rule." *Dallas Morning News v. Hall*, 579 S.W.3d at 381. Because all of these complained of statements are protected third party allegations on matters of public concern, Plaintiff has failed to state a claim for defamation with respect to these statements.

**E.    Plaintiff Has Failed To State a Claim For Defamation By Implication.**

Homestead Heritage also hints at a claim for defamation by implication, asserting that the Article alleges that Homestead Heritage "manipulates and abuses women, prohibits education, and violates the law." SAC ¶ 6. This claim, too, fails because defamation by implication, like Plaintiff's claims based on the Complained of Statements, is defeated by all the same defenses and arguments raised by Defendant here. *See, e.g.*, *Dallas Morning News v. Hall*, 579 S.W.3d at 381 (defamation by implication claim dismissed where article was protected by the fair report and third-party allegation privileges); *Dallas Morning*

*News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018) (holding that implied accusation against parents in newspaper column was an opinion, and thus was not actionable defamation by implication); *Grotti v. Belo Corp.*, 188 S.W.3d at 771 (in a case where some statements allegedly implied that plaintiff was responsible for "suspicious" deaths, holding: "the Media Defendants established the substantial truth of each broadcast by accurately reporting third-party allegations and investigations"). Specifically, Plaintiff's contention that the Article implies that Plaintiff "manipulates and abuses women, prohibits education, and violates the law" is unreasonable because, as Defendant has demonstrated above, the statements upon which Plaintiff relies for these implications are not actionable as a matter of law. *See Hall*, 579 S.W.2d at 382 (where news reporting was not actionable under statutory privileges, alleged defamation by implication claim was also statutorily privileged). Moreover, despite Plaintiff's contention that the statements "were verified to be false prior to the Article's publication," SAC ¶ 6, Defendant included Plaintiff's denials in the Article. Thus, Plaintiff can point to nothing in the Article that is untrue or implies any facts that are actionable as a matter of law. Therefore, it has failed to state a claim for defamation by implication.

## II.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR UNJUST ENRICHMENT

Under Texas law, unjust enrichment occurs when one obtains a benefit from another by fraud, duress, or the taking of undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Plaintiff has alleged no fraud, duress, or taking of an undue advantage here – because there was none. Thus, Plaintiff has failed to state a claim for unjust enrichment.

Moreover, Plaintiff bases its unjust enrichment claim on the publication of the

Article, a constitutionally protected act. Plaintiff cannot plead around applicable constitutional protections by re-labeling the claim as something other than defamation when it arises from the same conduct. *See Snyder v. Phelps*, 562 U.S. 443, 458–59 (2011) (holding that the First Amendment barred plaintiffs' emotional distress claims because they were based on defendants' exercise of their First Amendment rights to speak publicly on a matter of public interest); *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (dismissing emotional distress claim because plaintiff could not prove the elements of a cause of action for defamation); *Rehak v. Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 733 (Tex. App.—Hou. [14th Dist.] 2013, pet. denied) (internal quotations omitted) (affirming dismissal of tortious interference, and other claims based on allegedly defamatory speech); *Bird v. W.C.W.*, 868 S.W.3d 767, 772 n. 7 (Tex. 1994) ("[I]t would be ironic if an individual could avoid all the constitutional restrictions on defamation actions merely by disguising such claim in negligence terms."); *Texas Beef Grp. v. Winfrey*, 11 F. Supp. 2d 858 (N.D. Tex. 1998) (rejecting negligence claims creatively pled in attempt to avoid constitutional protections for defamation); *Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1104-06 (D.D.C. 1991) (The lesson of *Falwell* is that courts may not permit plaintiffs, through creative pleading, to invoke other torts as a vehicle for "end-running other requirements of defamation law."). Thus, because Plaintiff's defamation claim fails, its derivative unjust enrichment claim also fails.

## **CONCLUSION**

For the foregoing reasons, and specifically because Plaintiff has failed to state a cognizable claim in this matter, Plaintiff's Second Amended Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,


By:_/s/ Catherine L. Robb_
Laura Lee Prather
HAYNES AND BOONE, LLP
State Bar No. 16234200
Laura.prather@haynesboone.com
Catherine L. Robb
State Bar No. 24007924
Catherine.robb@haynesboone.com
Haynes and Boone, LLP
98 San Jacinto Blvd, Suite 1500
Austin, Texas 78701
Telephone:     (512) 867-8400
Telecopier:     (512) 867-8470

**AND**

/s/ Cameron Stracher
Cameron Stracher
CAMERON STRACHER, PLLC
1133 Broadway, Suite 516
New York, NY 10010
T: (646) 992-3850
F: (646) 992-4241
E: cam@stracherlaw.com

**ATTORNEYS FOR INDEPENDENT
DIGITAL NEWS & MEDIA, LTD.**

21

## <u>CERTIFICATE OF SERVICE</u>

The above signed certifies that a true and correct copy of the foregoing was served *via* ECF-CM on the 24th day of November, 2025 to:

J. Mitchell Little
Scheef & Stone, L.L.P.
2600 Network Blvd., Suite 400
Frisco, TX 75034

*Counsel for Plaintiff*

/s/ Catherine L. Robb
Catherine L. Robb
