## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **HERITAGE MINISTRIES d/b/a HOMESTEAD HERITAGE,** | § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | **CASE NO.: 6:25-CV-00364-LS** |
| **INDEPENDENT DIGITAL NEWS & MEDIA, LTD.,** | § § § | |
| *Defendant.* | § § § | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Heritage Ministries d/b/a Homestead Heritage ("Heritage") files its Brief in Opposition to Defendant Independent Digital News & Media, LTD.'s ("Defendant") Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"). Heritage requests that the Court dismiss Defendant's Motion because: (a) Defendant's Motion rests upon matters not contained in the pleadings and therefore is procedurally defective; (b) Heritage has plausibly pleaded a claim for defamation; and (c) Defendant's reliance on privilege and affirmative defenses is (i) premature at this stage, and (ii) improper because they are based solely on isolated sentences from the Article while ignoring that the Article is published in a way that creates a defamatory impression and is defamatory by the suggestive deductive meanings that emerge from it.

## <u>INTRODUCTION</u>

Homestead Heritage is a Christian community that celebrates its faith by pursuing a simple, agrarian lifestyle and promotes that faith by hosting visitors at the craft village on its property,

country markets, fall harvest festival, and annual Homestead Fair. Heritage's community seeks to live quiet and peaceful lives. That all changed when Defendant authored and published a scathing article ridiculing Heritage's faith and way of life, based on false statements—made by a handful of individuals—that Defendant uncritically accepted and advanced as true.

Heritage denies that the statements are true. But even if the statements are substantially true, Plaintiff has alleged a plausible defamation claim because the article creates a defamatory impression of Heritage, and the inferential and deductive meanings that emerge from the article as a whole and its discrete parts could be reasonably capable of a defamatory meaning. And that is all Federal Rule of Civil Procedure 8 requires. The Court should therefore deny Defendant's Motion.

## <u>FACTUAL ALLEGATIONS SET FORTH IN THE COMPLAINT</u>

On September 19, 2024, Defendant published an Article entitled "*Living in a 'cult' was all she knew – until a traumatic birth pushed her to escape,*" (the "Article").[1] The Article advances a false central thesis that Heritage manipulates and abuses women, prohibits education, and violates the law.[2] Although lightly veiled as allegations by others, or Defendant's beliefs, the Article provides—

    a.  COS1: That Heritage's community midwife "is unlicensed, practicing medicine illegally and left [a woman] with long term debilitating birth injuries."

    b.  COS2: "At Homestead Heritage, women are expected to get married and reproduce."

    c.  COS3: A woman during labor "did not receive pain medication, nor did she ask for it, because it went against church policy" and she was left with "permanent injuries to her pelvic floor."

    d.  COS4: "Church leaders hadn't allowed [Tabitha] to get married[.]"

---

[1] ECF 17,¶ 5.
[2] *Id.* ¶ 6.

    e.   COS5: That home education under Heritage includes "no history, math, science, nothing;"

    f.   COS6: That life at Heritage is "sinister, with a lack of education, adequate medical care and life options leaving them traumatized."

(the "Statements").[3]

Heritage alleges that COS5 is verifiably false because Heritage's high school graduation and curriculum center identifies the courses and requirements Heritage has of its students, which specifically include math and sciences.[4] Heritage further alleges that the gist of the Article is defamatory and, directly and indirectly, disparages Heritage by implying, among other things, that Heritage engages in criminal conduct. For example, the Article states that unlicensed midwives cannot administer anesthesia, perform pelvic exams, or suture third or fourth-degree tearing. The Article also discusses that one of Heritage's midwives, Amanda Lancaster, was unlicensed when she sutured a third-degree tear, administered anesthesia, and performed pelvic exams. In the same section, the Article states—

> Midwifery is an important part of Texas's cultural heritage, and the regulation of midwifery, to ensure better oversight and continuing education, began in the state in 1983. Anyone found to be practicing midwifery without a license in Texas can be charged with a civil offense, which carries a fine of up to $5,000. Anyone found to be performing an activity within the scope of the practice of medicine without a license can be charged with the unlicensed practice of medicine. That is a criminal offense, which can result in a $10,000 fine and 2-10 years in prison.

The Article's explicit reference to "criminal offense" and "civil offense" conveys to the average reader that Defendant is accusing Heritage of concrete, unlawful conduct, not merely expressing a subjective viewpoint or belief of another.[5] Heritage alleges that whether Heritage

---

[3] ECF 17, ¶¶ 5(a)-(f). For consistency, Heritage adopts the "COS" identifier as used in Defendant's Motion for each of the Complained of Statements.

[4] *Id.* at ¶ 9.

[5] *Id.* at ¶ 6.

condones unlicensed midwifery or allowed Lancaster to practice without a license is verifiable. Defendant could have requested Lancaster's certification or a copy of Heritage's practices and procedures—but it did not.

Heritage further alleges that before the publication of the Article, Heritage invited Defendant to speak with other Heritage members, but that Defendant declined to do so.[6] The Complaint further alleges that Heritage asked to meet with Defendant on August 31, 2024—two weeks before the Article's publication—but Defendant also declined this invitation. Instead, Defendant published the Article two weeks later and, through its legal counsel, sent a letter to Heritage.[7] The Complaint also alleges that Heritage sent a letter to Defendant identifying false statements and claims made in the Article, but that the Article remained published.

Defendant's Motion must be dismissed because the Statements, as well as the gist of the Article gist satisfy the low bar required of a plaintiff's pleading under Rule 8.

## **STANDARD**

Rule 12(b)(6) motions are inherently disfavored and should rarely be granted. *Madison v. Purdy*, 410 F.2d 99, 100 (5th Cir. 1969). Defamation cases are especially ill-suited for early dismissal because meaning, implication, falsity, privilege, and fault frequently depend on context and credibility—which are matters the jury is to decide, not the court at a preliminary stage of litigation and before any discovery has been conducted. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 622 (Tex. 2018).

When deciding a motion to dismiss, it is irrelevant whether the defendant believes it will ultimately prevail because the court must only consider the plaintiff's well-pleaded allegations.

---

[6] *Id.* at ¶ 5.
[7] *Id.* at ¶ 10.

*Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint survives dismissal if it pleads "enough factual matter (taken as true) to suggest" a plausible entitlement to relief. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

A claim is "plausible on its face" when the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level[.]" *Bell Atlantic Corp.*, 550 U.S. at 555. Rule 12(b)(6) does not permit courts to resolve factual disputes, weigh competing inferences, or adjudicate affirmative defenses that depend on factual development. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) (jury must determine meaning and import); *see also Netflix, Inc. v. Barina*, No. 04-21-00327-CV, 2022 WL 3908540, at *6 (Tex. App.—San Antonio Aug. 31, 2022, pet. denied) (motion to dismiss defamation claim was properly denied because the meaning of the publication could be interpreted differently by reasonable viewers). Particular relevant here, defamation claims are rarely suitable for dismissal where reasonable readers could draw differing interpretations from the publication. *Turner*, 38 S.W.3d at 114; *Netflix, Inc.* 2022 WL 3908540, at *6.

## ARGUMENT

### A. Defendant's Motion Should Be Denied Because Heritage Plausibly Pleads a Claim for Defamation.

To maintain a defamation claim, a plaintiff must plead facts alleging: (a) the defendant published a false statement to a third party; (b) that was defamatory concerning the plaintiff; (c) with the requisite degree of fault; and (d) damages. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015).

A statement is considered defamatory "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Id.* Additionally, under Texas common law, a statement is defamatory per se when it is obviously harmful such that a loss of reputation is

presumed. *Id.* at 596. For example, accusing another of a crime, engaging in sexual misconduct, or making remarks that adversely reflect on one's life pursuit are deemed defamatory per se—meaning damages are presumed. *Id.*

The threshold question is whether the words used are reasonably capable of a defamatory meaning. Texas and Fifth Circuit precedent require courts to evaluate the "gist" and overall impression of a publication, including inferences deduced from such publication, rather than isolated snippets. *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002). Although a statement may be "literally true, if the omission of material facts allows a reasonable person to perceive a false impression," the statement is actionable defamation. *In re Lipsky*, 411 S.W.3d 530, 544 (Tex. App.—Fort Worth 2013, no pet.).

Defamation is not a "one-size-fits-all" claim. Defamation arises in one of three ways: (1) explicitly, (2) "implicitly as a result of the article's entire gist," or (3) "implicitly from a distinct portion of the article." *Id.* (emphasis added). A publication's "gist" is defamatory when it includes discrete facts, literally or substantially true, but are published in such a way that they create a substantially false and defamatory impression or juxtaposes facts in a misleading way. *Turner*, 38 at 115. A publication is implicitly defamatory (sometimes referred to as defamation by implication) when the inferential, illative, suggestive, or deductive meanings that may emerge from a publication as a whole or its discrete parts *could* be reasonably capable of a defamatory meaning as the plaintiff alleges. *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002).

The central question being "whether the publication taken as a whole is more damaging to the plaintiff's reputation than a truthful publication would have been." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017). If the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting

that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 622 (Tex. 2018).

Here, Heritage specifically alleges that the gist of the Article, as well as, COS1 through COS6, imply that Heritage manipulates, oppresses, and abuses women and children, refuses to provide adequate medical care to women and children, fails to abide by education requirements, is engaged, or at least complicit, in criminal conduct, and specifically limits women to the duty "to marry and reproduce."[8] These inferences are deduced by the way the Article conveys, supports, and endorses alleged facts while omitting material information, thus injuring Heritage's reputation, exposing it to contempt and ridicule, and impeaching its integrity, virtue, and reputation. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015).

For example, the Article states that an unlicensed midwife cannot provide prenatal care, suture third-degree tears, or administer anesthesia. Indeed, in the same portion where the Article discusses that Heritage's midwife, Amanda Lancaster, was unlicensed when she provided prenatal care, sutured a third-degree tear, and administered anesthesia during delivery, causing "permanent" and "long term debilitating" injuries (COS1, COS3, COS6), Defendant states—

> anyone found to be practicing midwifery without a license in Texas c**an be charged with a civil offense**, which carries a fine of up to $5,000. Anyone found to be performing an activity within the scope of the practice of medicine without a license ***can be charged with the unlicensed practice of medicine. That is a criminal offense, which can result in a $10,000 fine and 2-10 years in prison***.

The implication above is, of course, that Heritage, in addition to condoning the criminal conduct of unlicensed midwifery, mistreats women and fails to provide medical care to women and children. And even though Lancaster's licensure as a midwife is verifiable, the Article only

---

[8] ECF 17, ¶¶ 5, 6, 8.

vaguely states that Lancaster "*says* she is a Certified Professional Midwife." Defendant deliberately omits from the Article any statements, references, or evidence that Lancaster is *actually* a verified Certified Professional Midwife, that Heritage requires its midwives to obtain licensure, or that any Heritage midwife is licensed. The Article omits, misconstrues and juxtaposes certain facts resulting in a defamatory meaning of the Statements and Article as a whole to emerge.

Additionally, although Defendant's Article does not explicitly say Defendant oppresses women or fails to abide by education requirements, Defendant repeatedly suggests as much in the way it frames the Article's narrative. For example, Defendant states on the very first page of the Article that some members—

> "live on a *500-acre compound of crop fields* and small homesteads near the Brazos River, *surrounded by other farmland*. Women have long hair and wear modest ankle-length dresses" … and have a "*sheltered existence [at] Homestead*[.]"

In the same portion, Defendant quotes a supposed statement from a former Heritage churchgoer outlining "how bleak life was there," as she "hadn't been to the movies, had a first date, gotten a haircut or graduated from college." A few paragraphs later, the Article discusses that a thirteen-year-old girl spent seven years washing dishes for the Homestead café without pay, and although she wanted to be a doctor, at nineteen was promoted to Heritage's "highly-regarded position for women" of server. Defendant doubled down and endorsed Heritage's alleged oppression of women and lack of education by stating, in its own words, COS2: "[a]t Homestead Heritage, women are expected to get married and reproduce."

Read in its entire context, any reasonable reader could construe COS2, COS5, and COS6 to imply that Heritage does not provide education or life options and oppresses women by: *sheltering* them on isolated *compounds surrounded by farmland*, prohibiting them from dating, *going to college*, or cutting their hair, and attributing their worth to their ability to bear children. The

Statements, including COS2, COS5, and COS6, "support the discrete implication that [Heritage]" contends is defamatory—that is, Heritage oppresses women and prevents children from attaining an education.

The Court must deny Defendant's Motion because: (a) the Article's gist, including its omissions of material facts, paints Heritage as a cult that oppresses women, engages in criminal, reprehensible, and otherwise non-virtuous conduct; and (b) the inferential, illative, suggestive and deductive meanings from the implications reasonably deduced from the Article as a whole, or its discrete subparts (COS1 through COS6), could be reasonably capable of the defamatory meaning Heritage ascribes to them. Although Heritage alleges that the Statements are false, even if the statements made by two self-proclaimed former Heritage members are true (which they are not), Heritage has plausibly alleged a claim for defamation because the Article creates a substantially false and defamatory impression and juxtaposes facts in a misleading way—which is all that is required. *Netflix, Inc. v. Barina*, No. 04-21-00327-CV, 2022 WL 3908540, at *6 (Tex. App.—San Antonio Aug. 31, 2022, pet. denied).

## B. Heritage's Complaint Plausibly Alleges COS1, COS3, and COS5 are "Of and Concerning" Heritage.

Defendant contends Heritage's defamation claim fails on COS1, COS3, and COS5 because those Statements are not "of and concerning" Heritage.[9] Defendant is wrong. Texas Courts, along with the Fifth Circuit, have repeatedly affirmed the principle that "a publication is of and concerning the plaintiff if persons who knew and were acquainted with the plaintiff understood from viewing the publication that the allegedly defamatory matter referred to the plaintiff." *In re Lipsky*, 411 S.W.3d at 544 (internal quotations omitted).

---

[9] ECF 18, *Defendant's Motion to Dismiss*, at 8.

Defendant argues COS1 (Amanda Lancaster, Heritage's community midwife, is unlicensed and practices medicine illegally) cannot be attributed to Heritage because "on its face the Article refers to the community's midwife and not to Homestead Heritage."[10] Similarly, Defendant contends COS3 (woman in labor did not receive pain medication because it went against church policy and was left with permanent injuries to her pelvic floor) and COS5 (home education under Heritage includes no history, math, science, nothing) do not concern Heritage because COS3 is "about how Noa Haugh was treated by Lancaster" and COS5 is about "Tabitha Haugh's mother, not about Homestead Heritage."[11]

The Article defines Heritage as a "conservative religious *community*." The Article uses the terms, "Homestead Heritage," the "community," the "organization," and the "church" synonymously. These terms are referenced more than 63 times throughout the article. Heritage is the singular focal point of the Article. The Article directs the Statements to "Homestead Heritage," its "community," its "church leaders," its ideals, and alleged practices.[12] COS1, COS3, and COS5, as well as the rest of the Statements, are "of and concerning" Homestead—no question.

>    i. *COS1 and COS3.*

COS1 concerns the alleged unlicensed practice of midwifery, negligent care for pregnant women, and medical injuries caused to Heritage members by its midwife. The Article starts by stating that two "former members [of *Heritage*]" filed complaints "against the *community* midwife." The Article specifically identifies Amanda Lancaster as "the *community midwife*" and was a part of the *community's* "midwifery team." COS3 concerns statements about how Noa Haugh, while under the care of the *community's* midwifery team, was not provided with medication

---

[10] *Id.* at 9.
[11] *Id.* at 8-10.
[12] ECF 17, ¶¶ 5-6.

during her labor and suffered "permanent injuries." In this same section of the Article, Defendant, in its own words, states that it reviewed a copy of the "*church's* birth form given out when women fall pregnant. The Article continues to say that the midwifery team "cared for older and dying members of the *community*." The Article also claims that another woman "had two children while in the *church*" and during her second pregnancy, a medical condition arose where the *church* gave its permission for her to visit a hospital. And if that were not enough, Defendant admits in the Article that it questioned *Heritage*, not Lancaster, regarding certain allegations made regarding the protocols and procedures implemented by the *Church* for pregnant women.

COS1 and COS3 are *only* about the conduct that occurred under Heritage's watch, with Heritage's midwifery team, and in connection with the services rendered on behalf of Heritage. Moreover, even if Heritage was implicated by COS3 and COS5 alone, Heritage became implicated when Defendant specifically sought Heritage's response on these matters.

     *ii.*       *COS5.*

Defendant asserts that COS5 cannot be actionable because it was Tabitha's mother, not Heritage, who homeschooled Tabitha. Defendant's self-serving narrow reading of the Article ignores the longstanding authority discussed above that whether a statement is capable of a defamatory meaning is based on the overall impression of the publication, including inferences deduced therefrom, not isolated snippets. *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002).

COS5 states: "as a child, Tabitha [a young girl at the time] dreamed of becoming a doctor. Instead, her mother homeschooled her. I learned the ABCs but that was pretty much it…there was no history math, science, nothing." The very next sentence in the Article reads "[a]t Homestead Heritage, women are expected to get married and reproduce." And instead of high school education, members "were instructed to read thousands of pages of *church's* literature and write

essays on it." One paragraph later, Defendant writes "at 13, Tabitha had two jobs: as a dishwasher at Café *Homestead* and working at the *organization's* bakery" but allegedly did not get paid because "children in the *community* do not receive an income." Then, in its own words, Defendant states "after seven years of washing dishes, Tabitha was promoted to server, a high-regarded position for women [in the *community*]."

The core message of the Article concerning COS5 is that Heritage fails to educate its children and stifles their pursuit of meaningful careers by requiring them to wash dishes without pay. Tabitha's mother is neither quoted nor identified in the Article, rather she is referred to only once and identified merely as "her mother." The portion of the Article in which COS5 is stated is focused solely on what is alleged Heritage, not Tabitha's mother, expected of its women: "to get married and reproduce," meaning, not becoming a doctor as Tabitha dreamed. COS5 is a verifiable fact concerning Heritage's education curriculum and Defendant could have sought Tabitha's education and employment records from Heritage, but it did not. For the same reasons all the Statements constitute defamation, COS1, COS3, and COS5 are "of and concerning" Heritage, and are exactly the type of defamatory meaning the Texas Supreme Court's opinions in *Tatum* and *Lipsky* prohibit.

## C. COS6 Is Not Protected Opinion as Defendant Suggests.

According to Defendant, COS6 is only the opinion of those who experienced life inside Heritage and is therefore protected. In support of this contention, Defendant, not surprisingly, omits any reference to *Bentley v. Bunton*. In *Bentley*, the Texas Supreme Court reaffirmed that "in determining whether a publication is an actionable statement of fact or a constitutionally protected expression of opinion," the "meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley*, 94 S.W.3d at 579. The focus is thus not whether a statement might

be labeled opinion, but whether a statement is verifiable within the entire context in which it was made. *Id.* at 581.

As discussed above, the gist and implications deduced from the Article, including COS6, are capable of bearing a defamatory meaning because the Article is written in such a manner that omits material facts to paint a picture that Heritage is a sinister cult that fails to educate children, adequately care for pregnant women and children, and engages in criminal, reprehensible, or otherwise non-virtuous conduct.

Aside from the defamatory implications made in the Article, COS6 is verifiably false. Whether there is a lack of education at Heritage is a fact that is verifiable. If Defendant had accepted Heritage's invitations to meet, Defendant could have verified that Heritage provides the requisite level of education as evidenced by Hartage's high school graduation records and curriculum center.

Whether there is adequate medical care is a fact that is verifiable. Whether medical care is adequate is determined by whether the providers: (i) possess the knowledge, training, certifications, and licenses required by providers in their field by federal and state law; (ii) care is based on evidence, tailored to patient's needs, provide treatment plans, and that the providers satisfy the accreditation standards applicable to their field; (iii) obtain informed consent from patients; and (iv) keep detailed and accurate medial records. Defendant did not verify this statement but could have by looking at employment records for Heritage's midwives, determining whether Heritage keeps accurate records of its patients, or whether Heritage's midwives possess the proper certifications and licenses.

**D.  The Fair Report, Fair Comment, and Third-Party Allegation Privileges Do Not Apply.**

Lastly, Defendant asks this Court to dismiss the Complaint, adopt Defendant's preferred interpretation of the Article, and apply conditional privileges that require evidentiary development. That is not the function of Rule 12(b)(6) because factual issues regarding the interpretation and

meaning of a publication must be decided by a jury. If the Court is not inclined to do so, the Motion should still be denied because the conditional privileges Defendant asserts do not apply, and in the alternative, the Statements are ambiguous and therefore whether they are capable of a defamatory meaning must be resolved by the jury.

> i. *COS1, COS5, and COS6 are not covered by the fair comment privilege.*

The fair comment privilege is narrow and does not apply to statements simply couched in terms of an opinion or report, but that may still imply a falsehood. Even if the facts on which the statement is based are included in a publication, if those facts are either incorrect or incomplete, or if the writer's assessment of them is erroneous, the statement may still be actionable defamation. This is why, even at common law, the privilege of fair comment did not extend to a false statement of fact, regardless of whether it was expressly stated or implied from an expression of opinion. Restatement (Second) of Torts, § 566, Comment *a* (1977). The imputation of dishonorable motives in connection with facts is itself to be classified as a statement of fact and as such not to be within the defense of fair comment. *Bentley*, 94 S.W.3d at 583. This is true especially in defamation cases based on the "gist" and defamation by implication.

In *D Mag. Partners, L.P. v. Rosenthal*, the Texas Supreme Court held that the media defendant was not entitled to dismissal based on the fair comment privilege because a reasonable construction of the article's gist was that Rosenthal acted fraudulently. 529 S.W.3d 429, 441 (Tex. 2017). In *Netflix, Inc. v. Barina*, the San Antonio Court of Appeals denied the media defendant's motion to dismiss based on the fair comment privilege because the defense "ignores the crux of [the plaintiff's] defamation claim, which depends on the gist of the entire episode." *Netflix, Inc. v. Barina*, No. 04-21-00327-CV, 2022 WL 3908540, at *6 (Tex. App.—San Antonio Aug. 31, 2022, pet. denied). Relying on *Rosenthal*, the court concluded that "if the gist of the show unfairly

defames [plaintiff], the media appellants cannot avail themselves of the fair comment privilege to obtain dismissal[.]" *Id.* Defendant cannot avail itself of the fair comment privilege for the same reasons that Heritage's Complaint states a plausible claim for relief. That is, the Article is defamatory because its gist and the implications that can be deduced therefrom could be construed to have a defamatory meaning.

   ii. *COS3(b) is not subject to the fair report privilege.*

  It is a well-settled legal principle that one is liable for republishing the defamatory statement of another. *Butowsky v. Folkenflik,* No. 4:18CV442, 2019 WL 2518833, at *13 (E.D. Tex. Apr. 17, 2019), *report and recommendation adopted*, No. 4:18CV442, 2019 WL 3712026 (E.D. Tex. Aug. 7, 2019). To avoid liability, a media defendant must establish that the fair report privilege applies to the defamatory publication. *Id.* A media defendant is ousted from the protection of the fair report privilege when the publication lacks a balance in the presentation of the proceeding. *Id*. at *15. And a defendant who "presents material under the pretense of a fair report when it is in actuality a sham effort to put forward one side's party line, is deservedly ousted from the protection of the privilege." *Id.*

  To establish the fair report privilege, the defendant must establish the publication is a fair, true, and impartial account of an official proceeding to administer the law and published after the matter ceased to be of public concern. *Id*; TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1)(B).

  To defeat the privilege, a plaintiff must show—or at this juncture allege—that the person making the statement knew it was false or did not act for the purpose of protecting the interest for which the privilege exists. *Butowsky*, No. 4:18CV442, 2019 WL 2518833, at *15. A plaintiff can also overcome a privilege by pleading that the allegations were made with knowledge that the information is false, or with reckless disregard for its truth value, or that the report is less than a

"fair and true" account *Id.* at 23. In *Express Publishing Co. v. Gonzalez*, 326 S.W.2d 544 (Tex. App. – San Antonio 1959), an article reported on the original petition filed in a lawsuit alleging Barrera and Gonzalez defrauded others of oil interests. *Id.* Although the article was "literally true" the court said it was not privileged because it neither fair nor impartial as the article relied only on the original petition and not subsequent events and pleadings in the case. *Id.* at 545. Similarly, the Eastern District Court of Texas held in *Butowsky* that a defendant's article was not privileged because the publication's challenged statements did not appear in the legal complaint but also because the article was a misleading account that omitted material information. *Butowsky*, No. 4:18CV442, 2019 WL 2518833, at *34.

In yet another attempt to isolate the Statements from the gist of the Article, Defendant bifurcates COS3 and contends that COS3(b) (the community's midwife's procedure left Noa Haugh with permanent injuries to her pelvic floor) falls under the "fair report" privilege. This is wrong on several grounds. *See id.* (it is improper to consider only individual statements rather than the publication as a whole when determining the applicability of privilege).

***First***, under Texas law, the court should determine the fair reporting privilege only when the facts are not in dispute and the language used in the publication is not ambiguous. *Klentzman v. Brady,* 456 S.W.3d 239, 252-53 (Tex. App.—Houston [1st. Dist.] 2014), *aff'd,* 515 S.W.3d 878 (Tex. 2017). Here, Heritage has pleaded that all Statements, including COS3(b), are in dispute because they are false and misleading. Although Defendant argues that the Statements are merely reports from former members, the Article does not provide the former members' reports, does not quote from them, and omits material information concerning those reports. Additionally, it is entirely unknown whether the Article's recitation of the former members' statements to Defendant is an accurate recounting of the former members' reports. Dismissal based on the fair reporting

privilege is premature at this stage, especially because, as set forth above, the gist of, and implications deduced from, the Article are capable of defamatory meaning or, at the very least, are ambiguous. Therefore, Defendant's fair reporting privilege fails.

**Second**, Defendant has the burden to establish its entitlement to the defense. *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 715 (Tex. 2016). To satisfy its burden, Defendant must establish that the Article was an account of an official proceeding. TEX. CIV. PRAC. & REM. CODE § 73.002(b(1)(B). The Article sets forth what it alleges life for women is like at Heritage. The Article only tangentially refers to a proceeding of any kind—the TDLR proceeding—and contrary to Defendant's suggestion, the Article refers only to the TDLR complaints, which are separate and apart from COS3(b).  In fact, the Article does not address the TDLR proceeding until later in the Article when discussing a period of time *after* Noa Haugh had already disassociated with Heritage, had given birth to a second child, and was no longer under the care of Heritage's midwife.

Defendant relies on the Second Circuit's opinion in *Kinsey v. New York Times Co.* But even in *Kinsey*, the court held that the publication concerned an official proceeding because: (a) the article "notes that is reporting on a specific court proceeding;" (b) the defamatory statement "was quoted directly from" a declaration filed in the proceeding; (c) the publication describes all seven declarations that were filed in the proceeding; (d) the publication directly "quotes from those declarations throughout;" and (e) the publication included photographs of the declarations. *Kinsey v. New York Times Co.*, 991 F.3d 171, 179 (2d Cir. 2021). None of those factors are present here; the Article does not: (a) note that it is about a specific court proceeding; (b) none of the Statements were direct quotes from the complaints; or (c) provide copies or otherwise quote from other documents relevant to the proceeding. Defendant cannot hide invoke the fair report privilege—no question about it.

**Third**, even if COS3(b) does relate to the proceedings at the TDLR, the privilege still does not apply because the TDLR proceedings were no longer matters of public concern when the Article was published, if at all. The complaints were filed more than six years ago, were never adjudicated on their merits, and concern the specific medical conditions of two women—not women as a whole, or Heritage's women as a group. It may be different if the Article claimed a prominent Chicago doctor had caused debilitating injuries to women as a result of illegal medical practices. Of course, in that scenario, millions of Chicago residents would be concerned and interested in such a case. Here, however, the Article itself claims that Heritage is a small, isolated community located on compounds surrounded by farmland. By itself, the locale in which the Article alleges Heritage operates removes any basis for public concern, particularly six years after the complaints were allegedly filed.

**Fourth**, assuming Defendant could establish that COS3(b) relates to the TDLR proceedings, the proceedings are covered under Section 73.002, and that the proceedings are currently matters of public concern, Defendant's fair reporting privilege still fails because the Article does not provide a fair, true, and impartial account of the proceedings involved. *Butowsky*, No. 4:18CV442, 2019 WL 2518833, at *15. Instead, the Article purports to recite the allegations of the two complaints but: (a) does not quote from the complaints nor attach copies of the complaints; and (b) makes only vague and ambiguous references to additional documents contained in the proceedings such as: (i) a written statement that accompanied one of the complaints; (ii) a September 2021 letter from the TDLR; and (ii) an alleged statement the TDLR provided to Defendant—although it is not clear when the statement was made, by who, or whether the statement was in writing or verbal. The Article's statements of only obsolete portions of the complaints while omitting substantive documents and information pertaining to the TDLR

proceedings as a whole is neither a fair nor impartial report.

Accordingly, Defendant's fair report privilege fails because the disputed facts must be decided by the jury, and COS3(b) does not concern a proceeding covered by Section 73.002. Alternatively, the Court should reject Defendant's assertion of the fair reporting privilege because the TDLR does not relate to a matter of public concern, nor is it a fair, impartial, and true reporting of the TDLR proceedings.

### iii.    *Defendant's third-party allegation privilege is equally problematic.*

Defendant contends that COS1, COS3, and COS4 through COS6 are privileged because they are allegations made by former members of Heritage.[13] The third-party allegation privilege, codified in Tex. Civ. Prac. & Rem. Code § 73.005(b), only extends to media defendants that accurately report allegations made by a third party regarding a matter of public concern. *Butowsky v. Folkenflik,* No. 4:18CV442, 2019 WL 2518833, at *13 (E.D. Tex. Apr. 17, 2019), *report and recommendation adopted*, No. 4:18CV442, 2019 WL 3712026 (E.D. Tex. Aug. 7, 2019).  A report is not accurate if it accuses, endorses, maligns, or "takes the extra step" of implying an accusation against the plaintiff based on an allegation made by a third party. *Netflix, Inc. v. Barina*, No. 04-21-00327-CV, 2022 WL 3908540, at *6 (Tex. App.—San Antonio Aug. 31, 2022, pet. denied). In *Netflix*, the court refused to apply the third-party allegation privilege because Netflix "took the extra step" by portraying the documentary in a way that suggested Netflix had adopted the allegations and that they had been confirmed. *Id*. at *6. The third-party allegation privilege does not apply here because Defendant did not merely take a "step," it took a leap.

Defendant published only a select few allegations made by former Heritage members while failing to (a) provide any context in which the allegations were reported to Defendant; (b) publish

---

[13] ECF 18, at 16.

written statements the former members provided; (c) reasonably investigate the allegations by refusing Heritage's invitations to provide information rebutting the allegations; and (d) omitting entire records relevant to the complaints filed by the former members. Defendant endorsed the allegations when, in its own words, said, among other things that "at Homestead Heritage, women are expected to get married and reproduce."[14] Defendant cannot now seek refuge behind this privilege after it endorsed the allegations and implied that they are true.

### E. Dismissal Based on Affirmative Defenses Is Not Appropriate Nor Is Dismissal Proper When the Meanings of the Statements are, at a Minimum, Ambiguous.

When the language of a publication's alleged defamatory statements or meanings are ambiguous, the question of whether such statements have a defamatory meaning should be resolved by the jury. *Tatum*, 554 S.W.3d at 631. Each defense on which Defendant relies requires factual determinations concerning accuracy, neutrality, context, attribution, and whether Defendant adopted allegations as fact rather than reporting them neutrally. And affirmative defenses may support dismissal only when they are apparent on the face of the pleadings. *Kansa Reinsurance*, 20 F.3d at 1366. When, as here, a complaint plausibly alleges falsity, distortion, selective omission, and malice, privilege defenses cannot be resolved on a motion to dismiss.

Alternatively, the Statements are, at a minimum, ambiguous as to what they mean and imply, and therefore the jury, and not the Court, is entitled to resolve these factual disputes after the parties have the opportunity to conduct discovery.

---

[14] ECF 17, ¶ 5(b).

### F. Heritage Adequately Pleads Fault, Including Actual Malice.[15]

The Complaint alleges Defendant knowingly published false statements after receiving detailed rebuttal information and requests for verification.[16] Defendant declined to interview current members, refused to visit the community, ignored written corrections, and published anyway.[17] Such allegations plausibly support negligence and actual malice. *Herman*, 730 F.3d at 466–67 (actual malice plausibly pled where defendants ignored contradictory information); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

### G. Heritage's Unjust Enrichment Claim Should Not Be Dismissed.

Defendant contends heritage's unjust enrichment claims fails because it is related to Heritage's defamation claim. However, federal pleading rules permit alternative theories at the pleading stage. FED. R. CIV. P. 8(d)(2)–(3). Dismissal is improper merely because two causes of action arise from the same conduct. The question is whether each claim asserts independent legal elements and seeks distinct relief — not whether the factual allegations overlap. At the pleading stage, plaintiffs are not required to elect remedies or prove exclusivity.

Here, Plaintiff's defamation claim seeks compensation for reputational and consequential harm, while the unjust enrichment claim seeks restitution and disgorgement of benefits Defendant wrongfully obtained through its unethical publication of the Article.

Unjust enrichment requires the plaintiff to plead that the defendant obtained a benefit from another by a taking of an undue advantage. *Digital Drilling Data Systems, LLC v. Petrolink Services, Inc.*, 965 F.3d 365, 383 (5th Cir. 2020). A "taking of an undue advantage" is not well defined in Texas, but the court in *Digital Drilling*, held that a plaintiff may premise their unjust

---

[15] Defendant's Motion does not contend Plaintiff failed to allege facts concerning actual malice. However, Heritage reiterates that its complaint satisfies its pleading burden by alleging such facts.
[16] ECF 17, ¶¶ 7–11, 21.
[17] *Id.* ¶¶ 5, 7–8, 11.

enrichment claim on conduct that, while not illegal, is nevertheless wrongful, unethical, or otherwise unjust. *Id.*

As discussed above, media defendants have an ethical and moral duty to report on matters fairly and accurately. Defendant did not do so when it published the Article. Heritage's Complaint alleges adequate facts to sustain a recovery of the disgorgement of benefits (namely, money and internet relevance) Defendant obtained as a result of its unethical conduct. The unjust enrichment claim seeks to recover damages based on a restitution theory, rather than for reputational harm. Accordingly, at this early stage of litigation, the court should deny Defendant's Motion because Heritage as plausibly alleged a claim for unjust enrichment.

**H. Dismissal With Prejudice Would Be Error.**

Even if the Court identifies pleading deficiencies, leave to amend must be granted unless amendment would be futile. *Fuller v. Rich*, 925 F. Supp. 459, 461 (N.D. Tex. 1995), *aff'd in part*, 91 F.3d 138 (5th Cir. 1996)**.** Heritage has pled detailed facts and can further refine allegations concerning the defamatory gist and implications deduced from the Article, if necessary.

## <u>CONCLUSION</u>

Supreme Court Justice Stewart is quoted saying "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty…Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." Defendant may dispute that the Article has a defamatory meaning. That, however, is not the standard. The standard is merely whether Heritage has pleaded a plausible claim for defamation—and given the foregoing, the only reasonable conclusion is a resounding "yes." The

Court should deny Defendant's Motion and allow this case to proceed on its merits, just as decades of legal authority would dictate.

Dated: December 12, 2025

Respectfully submitted,

**SCHEEF & STONE, L.L.P.**

By: */s/ J. Mitchell Little*
      J. Mitchell Little
      State Bar No. 24043788
      mitch.little@solidcounsel.com
      Steven B. Coffin
      State Bar No. 24126360
      Steven.Coffin@solidcounsel.com
      2600 Network Blvd., Suite 400
      Frisco, Texas 75034
      (214) 472-2100 Telephone
      (214) 472-2150 Telecopier

***Attorneys for Plaintiff***

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on January 12, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants, or who have registered for electronic notice, or who have consented in writing to electronic service, will be served through the CM/ECF system.

*/s/ J. Mitchell Little*