# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | | |
|---|---|---|
| **HERITAGE MINISTRIES,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **No. 6:25-CV-00364-LS** |
| | § | |
| **INDEPENDENT DIGITAL NEWS & MEDIA, LTD.,** | § | |
| | § | |
| | § | |
| ***Defendant.*** | § | |

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO FILE AN AMENDED COMPLAINT TO ADDRESS THE FAULT ELEMENT OF DEFAMATION**

Plaintiff Heritage Ministries sues Defendant Independent Digital News & Media, Ltd., for defamation and unjust enrichment.[1] Defendant filed a motion to dismiss the Second Amended Complaint for failure to state a claim.[2] The Court grants the motion and authorizes Plaintiff to file a final amended complaint..

## I. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[4] All well-pleaded facts are accepted as true and viewed in the light most favorable to the plaintiff.[5] "Rule 12(b)(6)

[1] ECF No. 17.
[2] ECF No. 18.
[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[4] *Id.*
[5] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation omitted).

motions are 'viewed with disfavor and rarely granted.'"[6] However, "'naked assertion[s]' devoid of 'further factual enhancement'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to the presumption of truth.[7]

A federal court sitting in diversity applies the substantive law of the forum state.[8] In Texas, defamation is defined as (1) the publication of a false statement of fact to a third party, (2) that was capable of defamatory meaning concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages.[9] "Establishing the falsity of an allegedly defamatory article is not as simple as showing that the article contains a statement that falls short of literal truth."[10] "A statement may be false, abusive, unpleasant or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances."[11]

## II. DEFAMATION

### A. Allegations.

In Defendant's article titled *Living in a 'cult' was all she knew – until a traumatic birth pushed her to escape*, a reporter spent a year interviewing six former members of Heritage, a "conservative religious community in Waco, Texas."[12] Centering on three former Heritage members, the article recounts how the women left the community following traumatic birth

---

[6] *Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024) (citation omitted).
[7] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (noting the court will not "strain to find inferences favorable to the plaintiffs" or credit "conclusory allegations, unwarranted deductions, or legal conclusions" (quoting *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004))).
[8] *See Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014) (citation omitted).
[9] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).
[10] *Polk Cnty. Publ'g Co. v. Coleman*, 685 S.W.3d 71, 76 (Tex. 2024); *see KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016) ("A statement need not be perfectly true; as long as it is substantially true, it is not false.").
[11] *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App. 2003); *see Bentley v. Bunton*, 94 S.W.3d 561, 587 (Tex. 2002) ("That a statement is defamatory—that is, injurious to reputation—does not mean that it is false, and vice versa.").
[12] ECF No. 17 at 1; ECF No. 17-1 at 1.

experiences facilitated by "the church's lead midwife, Amanda Lancaster."[13] After leaving the church, which the former Heritage members described as "a 'cult' that limits people's autonomy and controls nearly every aspect of their lives under the threat of salvation,"[14] the women have been able to pursue their individual life goals. Throughout the article, responses from both Heritage and Lancaster are included to address the members' allegations. The article also includes Lancaster's full two-page response explaining her perspective on her qualifications and the community's "standard of care regarding childbirth and healthcare."[15]

Noa Haugh, one of the three featured women, met with Lancaster during her pregnancy to discuss her upcoming birth.[16] When Noa asked Lancaster if she was licensed to practice midwifery, "Lancaster replied that she was not, but reassured [Noa] that what [Lancaster] was doing was legal."[17] Throughout the pregnancy, Lancaster performed cervical exams, used an ultrasound machine, and provided prenatal care.[18] Notwithstanding this medical care, the article quotes Lancaster explaining that "[a]ll mothers in my care sign informed consent forms, clearly acknowledging that I am not a state licensed midwife and that they are seeking personal support, not professional medical care."[19] The article notes that anyone practicing midwifery in Texas without a license is subject to civil and criminal offenses.[20]

---

[13] ECF No. 17-1 at 11.
[14] *Id.* at 6.
[15] *Id.* at 22–24.
[16] *Id.* at 11.
[17] *Id.*
[18] *Id.* at 11.
[19] *Id.* at 12.
[20] *Id.*

According to Noa, "[f]or Lancaster to deliver the baby…the couple had to agree not to sue [Lancaster] if something went wrong."[21] The article also quotes "a copy of the church's birth form given out when women fall pregnant" that states:

> In the event that mother, baby, or both should die or suffer permanent injury, the husband must ensure that it is clearly understood that he and his wife stood solely responsible for the birth and for all decisions and that the sisters attending were there as nothing more than family or friends.[22]

Noa was in labor for seven hours without asking for pain medication "because it went against church policy."[23] Heritage denied this assertion in the article and stated that it has "no policy whatsoever on the use of pain medication."[24] Because Noa was struggling during labor, Lancaster considered performing an episiotomy ("a surgical incision in the perineum and vaginal wall to make the opening larger for childbirth").[25] While Noa was able to deliver the baby without the episiotomy, she eventually hemorrhaged and suffered a third degree tear that Lancaster herself "sewed . . . back together" after administering anesthesia.[26] As Lancaster explained: "In cases of hemorrhage, my paramedic training allows me to handle these emergencies . . . Suturing is included in our training, and we refer mothers to specialists for postpartum complications such as incontinence or prolapse."[27] Still, Noa explains that she never saw any medical professionals after the birth and was left with permanent injuries to her pelvic floor.[28] She and her husband left Heritage a year later.[29]

---

[21] *Id*.
[22] *Id*. at 13.
[23] *Id*.
[24] *Id*. at 13 (internal quotations omitted).
[25] *Id*.
[26] *Id* at 14.
[27] *Id*. at 15.
[28] *Id*.
[29] *Id*.

When Noa became pregnant again outside Heritage, an examining midwife in San Antonio told her that she was "improperly sewn up during her first birth, which led to her tissue not healing correctly."[30] The San Antonio midwife encouraged Noa to file a complaint with the Texas Department of Licensing and Regulation ("TDLR"), which enforces administrative laws.[31] The article details Noa's injuries:

> According to Noa's medical records, her injuries were serious – they suggest she suffered a rectocele, meaning a vaginal prolapse where the rectum bulges into the vaginal wall. "Her rectocele results in an inability to move her bowels without placing digits in the vagina," the midwife wrote in a 2021 statement submitted to the TDLR. "Had the repair following…birth been done correctly, the pelvic floor muscles would have joined together preventing the rectocele and resulting in a stronger pelvic floor."[32]

TDLR could not investigate Noa's complaint because the incidents in question fell outside of the agency's two-year statute of limitations.[33] However, another former Heritage woman, Morning Alexander, eventually joined in Noa's complaint against Lancaster.[34] When Alexander was pregnant the first time, she woke up in a pool of blood and called Lancaster.[35] When Lancaster arrived, "she rang the group's medical doctor . . . and asked if [Alexander] should go to the hospital."[36] Only after the church leaders "pray[ed] about the matter first" did she receive permission.[37] Weeks later, she went back to that hospital to deliver her son.[38] During her second pregnancy, Alexander went into labor at just 35 weeks, and the baby was breech.[39] Lancaster was able to turn the child out of the breech position but the umbilical cord prolapsed, restricting oxygen

---

[30] *Id*. at 16.
[31] *Id*.
[32] *Id*. at 17.
[33] *Id*. at 16.
[34] *Id*. at 18.
[35] *Id*. at 18.
[36] *Id*. at 20.
[37] *Id*.
[38] *Id*.
[39] *Id*. at 21.

to the baby.[40] After delivery, "Lancaster administered life-saving oxygen to the baby," but then she "crow[ed] about how she had always wanted to deliver a premature baby and this was her first time doing it."[41] When Alexander eventually left Heritage, her experience drove her to become a labor and delivery nurse.[42] Because her parents, "who had previously left the church, wanted her to have some level of education," Alexander obtained her GED when she turned seventeen, making it "easier for her to go to nursing school once she left the church."[43]

In contrast, despite her childhood dreams of becoming a doctor, Tabitha Haugh, Noa's sister-in-law and the third featured member, was homeschooled by her mother and learned only her "ABCs . . . [and] no history, math, science, nothing."[44] Even though "[Heritage] women are expected to get married and reproduce,"[45] the "church leaders hadn't allowed [Tabitha] to get married" because she "was not worthy of being a wife at the moment because [she] was not showing wife character traits."[46] According to Tabitha, when she chose to step away from the church, she lost both her job at Heritage and her home.[47] Heritage denies in the article that Tabitha lost her home, denies that she was fired, and asserts that Tabitha sold her house for $100,000 after leaving the church.[48]

**B. Analysis**

Plaintiff's Second Amended Complaint alleges that Defendant "falsely accuses Heritage of the crime of practicing midwifery without a license; prohibiting the use of pain medication; and

[40] *Id*.
[41] *Id*. at 21.
[42] *Id*. at 27–28.
[43] *Id*. at 27.
[44] *Id*. at 8.
[45] *Id*.
[46] *Id*. at 32.
[47] *Id.* at 32–33.
[48] *Id*. at 33.

engaging in practices that make birthing complications more likely and dangerous."[49] Plaintiff lists six sentences from the article that are "false and salacious,"[50] but also contends that "the general tenor" of the article "directly and indirectly disparages Heritage . . . by claiming Heritage manipulates and abuses women, prohibits education, and violates the law."[51] In its motion to dismiss, Defendant analyzes the six delineated statements individually.[52]

However, "[i]t is well settled that 'the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the *entirety of a publication and not merely on individual statements*.'"[53] The Court finds that a reasonable person, after reading the entire article, could perceive that Heritage limits its members' educational, financial, and social prospects and authorizes pseudo-"medical" expertise, which can and did lead to serious birth injuries.

This implication could "harm the reputation of another as to lower [Plaintiff] in the estimation of the community or to deter third persons from associating or dealing with [it]" and is thus capable of defamatory meaning.[54] For example, although the article does not explicitly state that any former member was unequivocally barred from using licensed medical professionals, it quotes Alexander explaining that she was "terrified of [Lancaster] . . . [and] stepping outside the covering of God [i.e., not using Lancaster]" for fear that "[God] could kill your child just to teach you a lesson."[55] Additionally, it paints a picture of members' cabined and rudimentary education,

---

[49] ECF No. 17 at 1.
[50] ECF No. 17 at ¶ 5.
[51] *Id*. at ¶ 6.
[52] *See* ECF No. 18 at 8–18.
[53] *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (internal quotations omitted) (emphasis added).
[54] *Innovative Block of S. Texas, Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (citation and quotations omitted). Plaintiff has claimed it has suffered "significant economic and reputational damages," which is undisputed by the parties. *See* ECF No. 17 at ¶ 12.
[55] ECF No. 17-1 at 25.

noting that "[i]nstead of a high school education, former members say they were instructed to read thousands of pages of the church's literature and write essays on it."[56] The article describes severely limited financial freedom, with "children in the community [] not receiv[ing] an income" despite working and the promotion from dishwasher to restaurant server as "a highly-regarded position for women."[57] Read in the light most favorable to Plaintiff, an ordinary reader could conclude that Defendant "subject[s] women to unsafe medical practices and physical, emotional, and sexual abuse, and fail[s] to provide and/or require children to receive necessary educational services."[58] Moreover, the allegations about Heritage proscribing pain medication[59] and the use of licensed professionals during pregnancy,[60] along with its homeschooling policy,[61] are provable and/or refutable.[62]

Nevertheless, Plaintiff has not sufficiently pled the requisite fault element.[63] "In the defamation context, negligence is defined 'as the failure to investigate the truth or falsity of a

---

[56] *Id.* at 8.
[57] *Id.* at 10. The Court notes that while the exhibit page is truncated at the bottom, the full article includes this information.
[58] ECF No. 17 at ¶ 18. "[C]ourts sometimes determine that a statement is capable of at least one defamatory and at least one non-defamatory meaning. When that occurs, 'it is for the jury to determine whether the defamatory sense was the one conveyed.'" *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 632 (Tex. 2018) (citation omitted).
[59] ECF No. 17-1 at 13.
[60] *Id.*
[61] *Id.* at 10.
[62] While the Court agrees with Defendant that the description of life inside Heritage as "sinister" is protected opinion, the article's defamatory meaning must still be examined in the aggregate. *See* ECF No. 18 at 12–13.
[63] Plaintiffs who are public figures must plead that the defendant published a defamatory falsehood with actual malice, or "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Private plaintiffs need only establish that the defendant was at least negligent, which requires showing that a defendant "knew or should have known that the defamatory statement was false." *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976). This liability "may not be predicated upon 'a factual misstatement whose content [would] not warn a reasonable prudent editor or broadcaster of its defamatory potential.'" *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348 (1974)); *see Day v. Fed'n of State Med. Bds.*, 579 S.W.3d 810, 822 (Tex. App.—San Antonio 2019, pet. denied). According to the Second Amended Complaint, "Defendant claim[ed] that

statement before publication, and the failure to act as a reasonably prudent person.'"[64] The Second Amended Complaint alleges that Defendant "reached out by email to Heritage for comment on a story it had been working on for close to a year"; "spent a year interviewing six former members of Heritage but interviewed no current members"; and declined to meet with Heritage's representatives "over the Labor Day holiday weekend, on a Saturday."[65] Plaintiff also alleges that the reporter "received multiple answers to her inquiries from Heritage, none of which were included or incorporated into her story."[66] This is plainly false.

For example, after quoting former members who describe the organization as a "cult," the article includes Heritage's response.[67] Following Tabitha's homeschooling comment, the article provides Plaintiff's response that "each family is free to choose its own curriculum and teaching."[68] After describing Noa's birth attended by the unlicensed Lancaster, the article incorporates Heritage's statement that "[w]e respect every woman's right to give birth in the place and manner of her choosing, and there is no requirement for any particular healthcare choice."[69] When Noa describes the policy prohibiting the use of pain medication, the article includes

---

Heritage is a public figure," while the Plaintiff deems itself as a private figure, but the discussion ends there. *See* ECF No. 17 at ¶¶ 10, 15, 20–21.

[64] *Day*, 579 S.W.3d at 822 (citation omitted); *Copeland v. State Farm Ins. Co.*, 657 Fed. Appx. 237, 241-42 (5th Cir. 2016) (per curiam) (holding that defendants' discussion of plaintiff's possible identity theft scheme did not meet the negligence threshold in a defamation claim); *Hurd v. Reading*, No. 13-22-00146-CV, 2024 WL 851553, *5 (Tex. App.—Corpus Christi–Edinburg Feb. 29, 2024, pet. denied), *reh'g denied* (Apr. 30, 2024) ("A reasonably prudent person would not publicly accuse someone of a crime without any knowledge of the claim's truth or falsity.").

[65] ECF No. 17 at ¶ 5; *see Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 744–45 (5th Cir. 2019) (holding that negligence allegations were conclusory in a motion to dismiss). Plaintiff also contends that Defendant's "callous actions are much more than a reporter following a lead; it was a calculated attack to financially and reputationally dismantle a faith-based community organization." ECF No. 17 at ¶ 11.

[66] *Id.* at ¶ 5.

[67] ECF No. 17-1 at 7.

[68] *Id.* at 10.

[69] *Id.* at 13. Although Lancaster is not a party to this case, the Court notes that Defendant also included the entirety of Lancaster's letter in response to the Article. *See id.* at 23–24.

Heritage's denial that the church has any such policy.[70] After Noa states that she feels like "Homestead Heritage had stolen her life," the article includes Heritage's assertion that the organization is filled with "doctors, lawyers, engineers, and . . . executive professionals."[71] Finally, the article includes Heritage's denial of Tabitha's claims that she was fired and lost her home after leaving the church.[72]

To be sure, balanced reporting can nevertheless constitute defamation at the Rule 12(b)(6) stage.[73] But the comprehensive inclusion of Heritage's responses demonstrates that Defendant exercised reasonable care in its reporting. And Heritage's allegation that none of its responses were included in the article is demonstrably false. Because Plaintiff fails to plausibly allege that Defendant acted negligently, much less with actual malice, Plaintiff fails to establish a *prima facie* case of defamation. The Court grants Defendant's Rule 12(b)(6) motion to dismiss because Plaintiff insufficiently pleads the requisite fault element.

## III. UNJUST ENRICHMENT

To prevail on an action for unjust enrichment, a plaintiff must prove that "one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."[74] However, unjust enrichment is not a proper remedy merely because it "might appear expedient or generally fair that some recompense be afforded for an unfortunate loss" to the claimant.[75]

---

[70] *Id.* at 13.
[71] *Id.* at 31.
[72] *Id*. at 33.
[73] *See Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 627 (Tex. 2018) ("[A] defendant may be liable for a 'publication that gets the details right but fails to put them in the proper context and thereby gets the story's "gist" wrong.'" (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)).
[74] *Sw. Bell Tel. Co. v. Mktg. on Hold*, 308 S.W.3d 909, 921 (Tex. 2010) (quoting *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). The Texas Supreme Court has not directly held whether unjust enrichment can be asserted as an independent cause of action, but numerous Texas courts of appeal have held it cannot be. *See Spellmann v. Love*, 534 S.W.3d 685, 693 (Tex. App.—Corpus Christi 2017, pet. denied) (holding that unjust enrichment is not independent cause of action in a contracts case); *R.M. Dudley Constr. Co. v. Dawson*, 258 S.W.3d 694, 703 (Tex. App.—Waco 2008, pet. denied) (similar).
[75] *Pope v. Garrett*, 211 S.W.2d 559, 560–62 (1948).

Here, Plaintiff alleges that Defendant is "financially benefitting [from] and commercially capitalizing" on the article to Plaintiff's detriment, and that the "advertising value equivalent of the visibility drawn by the article and publications containing Defendant's defamatory statements exceeds $4,600,000."[76] But with insufficient allegations of fraud, duress, or the taking of undue advantage, Plaintiff's unjust enrichment claim fails.

## IV. CONCLUSION

For these reasons, Defendant's Motion to Dismiss [ECF No. 18] is **GRANTED**. Plaintiff is granted leave to file an amended complaint **on or before October 16, 2026**.

**SO ORDERED**.

**SIGNED** and **ENTERED** on September 29, 2026.



**LEON SCHYDLOWER**
**UNITED STATES DISTRICT JUDGE**

[76] ECF No. 17 at ¶¶ 26–27.